GILLER v. HOLLYFIELD.

Opinion delivered April 2, 1928.

MINES AND MINERALS—OPERATION OF LEASE.—In a suit by a lessee of
oil and gas property, who was entitled to use the surface for
agricultural and other purposes, to restrain the lessor from con-
structing a dam at the junction of creeks for the purpose of
establishing a pick-up station to catch waste oil, evidence *held*
to sustain the chancellor's finding that the construction of the
dam would interfere with the effective operation of the lease.

Appeal from Union Chancery Court, Second Divi-
sion; *George M. LeCroy*, Chancellor; affirmed.

*Patterson & Rector*, for appellant.

*Powell, Smead & Knox*, for appellee.

HUMPHREYS, J.   Appellants were enjoined by decree
of the chancery court of Union County, Second Division,
from constructing a dam at the junction of two small
creeks near the southeast corner of the northwest quar-
ter of the southwest quarter, section 11, township 16
north, range 15 west, in said county, for the purpose of
establishing a pick-up station to catch waste oil running
into said creeks from oil wells on lands other than the
40-acre tract described and the 40-acre tract immediately
west of it, said 80-acre tract having been leased by appel-
lants to appellees for development of oil and gas for com-
mercial purposes.   An appeal has been duly prosecuted
to this court from the decree.

There is no dispute between the parties as to the
law applicable to the facts under the terms and provisions
of the oil and gas lease made between the parties.   It is
an ordinary commercial oil and gas lease, known as the
producers' 88 form, in use in the Arkansas oil fields,
except that it required the lessees to begin drilling within
a month from the date thereof, to pay a portion of the
consideration out of the proceeds of oil and gas produced
on the lands, and without a provision for extending the
lease by payment of rents.   The dispute in the case is
one of fact and not of law.

The construction of leases of this kind with reference
to the use of the surface of the lands leased is that the

lessor and lessee have concurrent possession thereof, the lessee being entitled to such parts thereof as are necessary for developing the oil or gas thereunder for commercial purposes and to market same, and to do everything on the premises necessary to make the operation of the lease effective, without hindrance or interference on the part of the lessor. The lessor is entitled to use all other portions of the surface for agricultural and other purposes, provided, in doing so, he does not interfere with the effective operation of the lease. This is the substance of the rule announced in the case of the *Standard Oil Company of Louisiana* v. *Oil Wells Salvage Company*, 170 Ark. 729, 281 S. W. 360.

Appellants contend for a reversal of the decree upon the alleged ground that the finding of the trial court, to the effect that the construction of the dam will interfere with the effective operation of the lease, was contrary to the weight of the evidence.

The proposed dam was to be 450 feet long and 3 feet high, across the space where the two creeks intersect near the southeast corner of the leased lands. The witnesses introduced by appellants testified that the dam would not cause the water and oil in the creeks above the dam to go any higher than the high water marks along the sides of the creeks, and that the high water in the creeks had never interfered with the effective operation of the lease. They testified that, according to the survey made by them, when the water and oil is raised against the proposed dam, as gauged by the spillways to be made therein, it would not be higher against the dam than two feet above low-water level. Also that the two-foot raise would cause the water to back toward and not closer than within 50 feet of well No. 6 in the southeast corner of said leased lands. Also that the high-water line around well No. 6 coincides with the level of two feet of water in the dam. Also that the construction of the dam would not interfere with the passageway appellees had constructed over the upper creek to go to and come

from wells 5 and 7, in the northeast corner of the leased lands, and would not interfere with the pipe lines used to convey oil from wells 5 and 7. They testified that they were unable to find the pipe lines leading from wells 5 and 7, but that if they were lying on the bottom of the creek they could easily be jacked up after the dam was built to make necessary repairs upon them.

The witnesses introduced by appellee testified that the construction of the proposed dam would back the water over well No. 6 and wash out the foundation under the derrick. Also that the water would back over the walkway across the upper creek and cover the pipe lines lying on the bottom of the creek through which oil was carried from wells Nos. 5 and 7.

The testimony was also conflicting between the two sets of witnesses as to whether the pick-up station made by the construction of the said dam would increase the fire hazard on the leased premises. Eighteen wells had been drilled upon the 80-acre tract which appellants leased to appellees, and fourteen of them were producing oil in commercial quantities when the construction of the dam was commenced.

It may be said, in passing, that the witnesses introduced by the respective parties were men of broad experience in the oil fields. It could serve no useful purpose to set out the substance of the testimony of each. The record is voluminous, and it would extend the opinion to an unusual length to do so. The testimony of each witness has been carefully read and analyzed, and a majority of the court is of opinion that the chancellor's finding to the effect that the construction of the dam will interfere with the effective operation of the lease is correct, and is supported by the weight of the evidence. Mr. Justice Wood and the writer are of the opinion that the construction of the dam will not interfere with the effective operation of the lease.

The decree is therefore affirmed.